

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
07/02/2014

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| RAQUEL TRICIA KING, | § | CASE NO. 13-30301-H4-7 |
| | § | |
| DEBTOR | § | |
| | § | |
| JOSEPH M. HILL, TRUSTEE, | § | |
| | § | |
| PLAINTIFF | § | |
| | § | |
| v. | § | ADVERSARY NO. 13-3142 |
| | § | |
| RAQUEL TRICIA KING, | § | |
| | § | |
| DEFENDANT. | § | |

## MEMORANDUM OPINION REGARDING THE TRUSTEE'S COMPLAINT OBJECTING TO DISCHARGE
### [Adv. Doc. No. 1]

### I.  INTRODUCTION

The dispute at bar is between the Chapter 7 trustee, Joseph M. Hill (the Trustee), and Raquel Tricia King (the Debtor). The Trustee requests that this Court deny the Debtor's discharge under §§ 727(a)(4)(A) or, alternatively, under 727(a)(3).[1]  [Adv. Doc. No. 1]. The Trustee also requests that this Court require the Debtor to pay his attorneys' fees for prosecuting this adversary proceeding. The Trustee argues that the Debtor's constant obfuscation of material facts and "slow as molasses" production of documents concerning her financial condition forced the Trustee and his counsel to spend an inordinate amount of time and money acquiring accurate information about the Debtor so that the Trustee could assess her case and fulfill his fiduciary duties to creditors in administering the estate. This Court is sympathetic to the Trustee's request

---

[1] Any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code, unless otherwise noted. Further, any reference to "the Bankruptcy Rules" refers to the Federal Rules of Bankruptcy Procedure.

for fees, particularly because the Court has decided to grant the Trustee's request to deny the Debtor's discharge. Nevertheless, the Court will not award attorneys' fees because there is no sound legal basis for doing so. Indeed, the Court has decided to issue this Opinion to emphasize to the bar that a plaintiff who has successfully prosecuted an Objection to Discharge cannot recover attorneys' fees and costs. Moreover, the Court issues this Opinion to emphasize to the debtors' bar that when counseling clients as to whether to file a bankruptcy petition, it is important to emphasize to them that they must disclose all of their assets—including assets not presently in their possession—and also be able to produce their financial records for the trustee's review; and that their failure to do either will jeopardize their ability to obtain a discharge.

This Court conducted a trial on June 11, 2011 on the Trustee's Complaint Objecting to Discharge. At the close of the trial, the Court took the matter under advisement. The Court now makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52, as incorporated into Bankruptcy Rules 7052 and 9014. To the extent that any Finding of Fact is construed to be a Conclusion of Law, it is adopted as such. To the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as such. The Court reserves the right to make any additional Findings and Conclusions as may be necessary or as requested by any party. For the reasons set forth herein, this Court sustains the Trustee's Complaint Objecting to Discharge.

## II.   FINDINGS OF FACT

1. On January 24, 2013, the Debtor voluntarily filed her Chapter 7 petition (the Petition Date) [Doc. No. 1], and the Trustee was appointed to administer the Debtor's Chapter 7 case.

2. The Debtor has an undergraduate degree in social sciences and a master's degree in social

work. [Trustee's Ex. No. 6, p. 21].  The Debtor was a co-owner and an officer of Healthy

Resources Enterprises, Inc. (HRE), and also a co-owner of several other businesses, with

Eric Boutte (Boutte), her ex-husband.  [Adv. Doc. No. 1, p. 1, ¶ 3; Tape Recording, June

11, 2014 Hearing at 10:53:49–10:53:59 a.m.].  The Debtor handled the finances for HRE.

[Tape Recording, June 11, 2014 Hearing at 10:54:44–10:55:07 a.m. & 10:54:24–10:55:35

p.m.].

**A. Findings of Fact Relating to Denial of the Debtor's Discharge under § 727(a)(4)(A)**

3. Approximately eight months prior to the Petition Date, on May 25, 2012, the Debtor, in

her divorce proceeding, filed her inventory and listed twenty-nine pieces of artwork that

she valued at $81,325.00.  [Trustee's Ex. No. 10, pp. 34–35].  The Debtor also listed

twenty-six pieces of jewelry in her divorce inventory, but did not place values on them.

[*Id.* at 39].  The Debtor signed under oath a Verification, which was filed with the

inventory, stating, in relevant part, that:

> I, RAQUEL KING BOUTTE, state on oath that, to the best of my
> knowledge and belief, this Second Amended Trial Inventory and
> Appraisement contains –
>
> 1. a full and complete list of all properties that I claim belong to the
>    community estate of me and my spouse, with the values thereof . . . .

[Trustee's Ex. No. 10, p. 29].

4. On July 27, 2012, the Debtor's divorce from Boutte was finalized.  [Debtor's Ex. No. 1].

5. On the Petition Date, the Debtor filed her original Schedules (the Original

Schedules).  [Doc. No. 1].  In the Original Schedules, the Debtor valued her jewelry and

artwork at $2,075.00 and $2,850.00, respectively.  [Doc. No. 1, p. 11].  She included all

3

twenty-six pieces of jewelry listed in her divorce inventory in the Original Schedules. [Trustee's Ex. No. 1, p. 11; No. 10, p. 39].

6. However, in the Original Schedules, the Debtor included only twenty-one of the twenty-nine pieces of artwork she had listed in her divorce inventory. [Trustee's Ex. No. 1, p. 11; No. 10, pp. 34–35]. The eight missing pieces of artwork were valued in the Debtor's divorce inventory at $31,950.00. [Trustee's Ex. No. 10, pp. 34 –35]. The twenty-one pieces she included in the Original Schedules were valued at $49,375.00 in her divorce inventory—representing an undervaluation of $46,525.00 (i.e., $49,375.00 - $2,850.00). [*Id.*].

7. On March 19, 2013, the Trustee emailed the Debtor and expressed concerns over the Debtor's valuations of her personal property. [Trustee's Ex. No. 2]. The email states in relevant part: "Regarding the Debtor's personal property, we may have an issue with its valuation. The Trustee would like to have someone inspect the property at some point before the exemptions are allowed." [*Id.*].

8. Thereafter, the Trustee retained two appraisers; one inspected and appraised the artwork; the other inspected and appraised the jewelry. In late June and early July of 2013, the Trustee received from his appraisers valuations of the Debtor's artwork and jewelry. The valuation for the jewelry was $19,250.00; and the valuation for the twenty-one pieces of artwork was $8,700.00.

9. On October 14, 2013, the Debtor amended Schedules A, B, C, and F (collectively, the Amended Schedules) [Doc. Nos. 73 & 74]. The Debtor, who had by this time had reviewed the valuations of her artwork and jewelry obtained by the Trustee, used the Amended Schedules to include these particular valuations and also to disclose a Jaeger-

LeCoutre Reverso watch—valued at $1,500.00—which she had omitted from the Original Schedules. The Amended Schedules, like the Original Schedules, listed only twenty-one of the twenty-nine pieces of artwork that the Debtor had listed in her divorce inventory.

10. Thus, in the Amended Schedules, the Debtor valued her jewelry at $19,250.00 [Doc. No. 73, p. 5] and her artwork at $8,700.00. [*Id.* at p. 4]. At trial, the Debtor testified that she amended the valuations of her artwork and jewelry on the Amended Schedules to reflect the valuations of the Trustee's appraisers. [Tape Recording, June 11, 2014 Hearing at 1:48:00–1:49:25 p.m., 1:50:04–1:50:14 p.m. & 1:51:20–1:51:35 p.m.]. The difference in value of the jewelry between the Original and Amended Schedules is $17,175.00 (i.e., $19,250.00 – $2,075.00). The difference in value of the artwork between the Original and Amended Schedules is $5,850.00 (i.e., $8,700.00 – $2,850.00).

11. As a sophisticated debtor, the Debtor knows full well that the Original Schedules and the Amended Schedules were filed under penalty of perjury.[2] Yet, the Debtor testified that she filed the Amended Schedules even though she does not agree with the valuations of the jewelry listed on these Schedules because she is unable to afford an appraiser. [*Id.* at 1:51:36–1:52:30 p.m. & 3:39:18–3:39:35 p.m.]. The Debtor further testified that she did not disclose eight pieces of artwork—even though she was awarded these pieces in the divorce [*Id.* at 1:38:10–1:38:15 p.m.]—because they were not in her actual possession. [*Id.* at 2:43:39–2:45:16 p.m.]. Moreover, she maintains that on the Original Schedules, she represented the value of the jewelry to be $2,075.00 and the value of the artwork to be $2,850.00 because she believed these values—which she claims were provided by

---

[2] By filing schedules, a debtor declares under the penalty of perjury that she has read the schedules, and that the information contained therein is true and correct to the best of the debtor's knowledge, information, and belief.

pawnshops—were accurate.  [*Id.* at 3:36:35–3:38:35 p.m.].  She did not explain why there was such a large discrepancy between the value she placed on the artwork in her divorce proceeding inventory ($81,325.00) and the value she placed on the artwork in the Original Schedules ($2,850.00) and the Amended Schedules ($8,700.00).

### B. Findings of Fact Relating to Denial of the Debtor's Discharge under § 727(a)(3)

12. On March 19, 2013, the Trustee sent an email requesting that the Debtor provide an accounting of her insurance policies and a set of bank records for the three years prior to the Debtor's Chapter 7 filing. [Trustee's Ex. No. 2].  Specifically, the Trustee requested "to see a complete accounting of all monies put into and taken out of the insurance policies from their inception . . . [and] to review the Debtor's bank records for the 3 years prior to bankruptcy, including statements, cancelled checks and deposit slips." [*Id.*].

13. On April 5, 2013, the Debtor provided bank records for various bank accounts: bank statements for the Chase account ending in 0220 (4/2012 to 12/2012), the Chase account ending in 3628 (2/2010 to 1/2013), and the Wells Fargo account ending in 4226 (10/2012 to 1/2013), as well as account "snapshots" for the Wells Fargo account ending in 1047 (12/2012 to 2/2013), the Wells Fargo account ending in 6692 (10/2011 to 2/2013), and the Wells Fargo account ending in 6689 (10/2011 to 3/2013). [Trustee's Ex. No. 4].  The Debtor also provided partial accountings for six of her seven life insurance policies, but did not provide any accounting for the seventh policy. [*Id.*].

14. On April 5, 2013, the Trustee and the Debtor came to an agreement, which required the Debtor only to obtain bank statements and insurance records from the date of the inception of the insurance policies. [Doc. No. 33 at 2, ¶ 4].

15. On April 10, 2013, the Trustee sent an email stating that the Debtor's document production was incomplete and requesting that the remaining documents be produced as soon as possible. [Trustee's Ex. No. 4].

16. On April 22, 2013, the Debtor sent an email to the Trustee indicating that she did not have the necessary funds to obtain the requested records because Wells Fargo quoted her a fee of $720.00 to produce the statements. [Debtor's Ex. No. 3]. On the same day, the Trustee replied by stating that there was no alternative solution and that the Debtor has the duty to produce the records to the Trustee. [Doc. No. 33-1, p. 1, ¶ 1].

17. On May 10, 2013, the Debtor filed a Motion for Protective Order, requesting that this Court prohibit the Trustee from making requests for the turnover of records from the Debtor. [Doc. No. 33].

18. On May 29, 2013, this Court issued an Order Denying Debtor's Motion for Protective Order. [Doc. No. 52].

19. On June 21, 2013, the Trustee filed the Complaint Objecting to Discharge. [Adv. Doc. No. 1].

20. On September 12, 2013, the Trustee sent subpoenas to various banks—including JPMorgan Chase Bank, Texas Community Bank, Capital Bank, and Plus4 Credit Union—commanding them to produce the Debtor's bank records. [Trustee's Ex. Nos. 12–15].

### III.  CREDIBILITY OF WITNESSES

Two witnesses testified at trial: (1) the Trustee; and (2) the Debtor. The Trustee testified forthrightly and was a very credible witness. The Court gives substantial weight to his testimony. The Debtor answered some questions forthrightly, but also gave some confusing and

non-responsive answers.  The Court gives some weight to her testimony, but not as much weight as the Trustee's testimony.

## IV.   CONCLUSIONS OF LAW

### A.  Jurisdiction, Venue, and Constitutional Authority to Enter a Final Order

#### 1.  Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a).  This dispute is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(J) and (O).  Furthermore, this dispute is core under the general "catch-all" language of 28 U.S.C. § 157(b)(2).  *See Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.").

#### 2.  Venue

Venue is proper pursuant to 28 U.S.C. § 1409(a).

#### 3.  Constitutional Authority to Enter a Final Order

*Stern v. Marshall*, 131 S. Ct. 2594 (2011), sets forth certain limitations on the constitutional authority of bankruptcy courts to enter final orders.  This Court must therefore determine whether it has constitutional authority to enter a final order in the dispute at bar.  This Court concludes that it does for the following reasons.

In *Stern*, the debtor, pursuant to 28 U.S.C. § 157(b)(2)(C), filed a claim based solely on state law, and the resolution of this counterclaim did not resolve the question of the validity of the defendant's claim.  131 S. Ct. at 2601.  Under those circumstances, the Supreme Court held that the bankruptcy court lacked constitutional authority to enter a final order on the debtor's

counterclaim. *Id.* at 2606. Here, the Trustee filed a complaint under § 727(a), a cause of action unique to the Code, and requests that this Court issue a judgment denying the Debtor's discharge; there is no state law involved. Therefore, this dispute is easily distinguishable from the suit in *Stern*, and this Court concludes that there is no *Stern* concern here. Thus, this Court has the constitutional authority to enter a final order in this suit. *See, e.g.*, *Murphy v. Felice (In re Felice)*, 480 B.R. 401, 434 (Bankr. D. Mass. 2012); *Tow v. Henley (In re Henley)*, 480 B.R. 708, 765 (Bankr. S.D. Tex. 2012).

### B. The Debtor Should Be Denied Her Discharge Under § 727(a)(4)(A)

Any debtor who files a Chapter 7 petition has a continuous, affirmative duty to disclose the following in a complete and accurate manner: (a) a list of creditors; (b) schedules of assets, liabilities, current income, and current expenditures; and (c) a statement of financial affairs. *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 208 (5th Cir. 1999). To successfully object to a debtor's discharge under § 727(a)(4)(A), a trustee or creditor has the burden of proving that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent to deceive; and (5) the statement related materially to the bankruptcy case. *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992). False oaths can take the form of either false statements or omissions on the schedules and statement of financial affairs or false statements by the debtor during the course of the bankruptcy proceedings. *Id.* Here, as discussed below, the Trustee has met this burden, and therefore, this Court concludes that the Debtor should be denied her discharge under § 727(a)(4)(A).

1.  <u>The Debtor Made Statements Under Oath, These Statements Were False, and the Debtor Knew Them to be False</u>

The Debtor, a sophisticated individual [Finding of Fact No. 2], signed the Original Schedules. [Finding of Fact No. 11]. Nevertheless, when the Trustee took issue with the valuations of various pieces of jewelry and artwork that the Debtor included on the Original Schedules [Finding of Fact No. 7], the Debtor subsequently amended her Schedules to reflect the Trustee's appraisers' valuations of the assets. [Finding of Fact No. 9]. The Debtor additionally testified during cross-examination that she still does not agree with the valuations of the jewelry listed on the Amended Schedules. [Finding of Fact No. 11].

Furthermore, the Debtor owns pieces of artwork that she has *still* failed to include in the Amended Schedules. The Debtor knew that the filing of the Original Schedules was an affirmation, under penalty of perjury, that the information in the Original Schedules was true and correct. [*Id.*]. By omitting the information that she did, the Debtor made false statements that the undisclosed eight pieces of artwork—which she valued in her divorce inventory to be $31,950.00 [Finding of Fact No. 6]—did not exist. *See West v. Family Express Corp.* (*In re Bilstat, Inc.*), 314 B.R. 603, 610 (Bankr. S.D. Tex. 2004). Thus, the information omitted in the Original Schedules, along with her failure to amend the Original Schedules to include *all* of her assets, constitute false statements that the Debtor knowingly made under oath.

a.  **The Inaccurate Valuations of the Jewelry and Artwork**

The Debtor has made several false statements concerning the values of her jewelry and artwork. With respect to the artwork, on her divorce inventory—which the Debtor filed under penalty of perjury [Finding of Fact No.3]—valued her artwork at $81,325.00. [*Id.*]. However, in the Original Schedules—which she also filed under penalty of perjury—she valued her artwork at a mere $2,850.00. [Finding of Fact No. 5]. Thus, there is a **material discrepancy** between

the sworn values that the Debtor placed on her artwork in the divorce proceeding and in this bankruptcy case—i.e., $78,475.00 ($81,325.00 - $2,850.00 = $78,475.00).   Once the Trustee questioned the low value that the Debtor placed on her artwork, she filed the Amended Schedules, and valued the artwork at $8,700.00.[3]  [Finding of Fact No. 10].   Thus, once again, the Debtor **still materially** undervalued her artwork compared to the value that she listed in her divorce inventory. Specifically, the discrepancy between the sworn values that the Debtor placed on her artwork in her divorce proceeding and in the Amended Schedules is $72,675.00 ($81,325.00 - $8,700.00 = $72,675.00).   The Debtor's testimony that she input the $8,700.00 value into the Amended Schedules because that is the value determined by the Trustee's appraiser does not somehow absolve her.   Indeed, even if she had never represented in the divorce inventory that the value of the artwork was $81,325.00, the initial value of $2,850.00 that she represented in the Original Schedules is materially lower than the $8,700.00 that she set forth in the Amended Schedules after the Trustee raised the issue.   In sum, in every respect, the Debtor has materially misrepresented the value of the artwork to her creditors.

With respect to the jewelry, in the Original Schedules, the Debtor valued her jewelry at $2,075.00.[4]  [Finding of Fact No. 5].   Once again, in order for her valuations to coincide with the valuations of the Trustee's appraisers, in the Amended Schedules, the Debtor valued her jewelry at $19,250.00.  [Finding of Fact No. 10].   Thus, there is also a **material discrepancy** between the values that the Debtor placed on her jewelry in the Original Schedules and the Amended Schedules—i.e., $17,175.00 ($19,250.00 - $2,075.00).  Further, the individual pieces of jewelry

---

[3] The Court notes that although the Debtor valued her artwork on the Amended Schedules at $8,700.00, the individual values of each piece of artwork total $9,100.00. Attached hereto as Exhibit A is a chart of the Debtor's valuations of each piece of artwork in the divorce proceedings, the Original Schedules and the Amended Schedules.

[4] The Court notes that although the Debtor valued her jewelry on the Original Schedules at $2,075.00, the individual values of each piece of jewelry total $2,055.00. Attached hereto as Exhibit B is a chart of the Debtor's valuations of each piece of jewelry in the Original Schedules and the Amended Schedules.

listed on her Amended Schedules actually total $24,285.00, not $19,250.00—thereby making the discrepancy even greater than $17,175.00.  *See* Exhibit B.  These gross discrepancies alone demonstrate not only the existence, but also the degree, of falsity that the Debtor made under oath.

Furthermore, at trial, the Debtor testified that she *still* does not believe that the valuations of her jewelry are correct.  [Finding of Fact No. 11].  The Debtor further explained that she did not have the funds to hire an appraiser to provide valuations of her own, so she adopted the Trustee's appraisers' valuations—even though she does not agree with the valuation of the jewelry.  [*Id.*].  If the Debtor does not agree with the valuation by the jewelry appraiser, she should not have amended the Original Schedules representing that the value of this jewelry is the amount that the Trustee's appraiser provided.  By doing so, the Debtor has given a false oath.

In sum, the Original Schedules and the Amended Schedules constitute statements under oath for the purposes of a discharge objection under § 747(a)(4).  *See, e.g.*, *Turnbow v. Blundy (In re Blundy)*, Bankr. Nos. 10–83658, Adv. Nos. 11–8019, 11–8070, 2012 WL 4506663, at *6 (Bankr. C.D. Ill. Sept. 28, 2012).  Under the circumstances described above, the Debtor has made false oaths knowingly with respect to the inaccurate valuations of her jewelry and artwork.

### b.  The Omissions of the Eight Pieces of Artwork on Both the Original Schedules and the Amended Schedules

The Debtor included twenty-nine pieces of artwork in her divorce inventory, but omitted eight pieces on both the Original and Amended Schedules.[5]  [Finding of Fact No. 6].  The Debtor

---

[5] These eight pieces of artwork include: (1) Charles Bibbs – Painted Plate; (2) Catlette – Black Girl; (3) Jacob Lawrence – Artist in Studio (numbered); (4) Catherine – Lady – original; (5) Catherine – Group of people walking with umbrellas – original; (6) Marcus Glenn – Mario & Howard with Basquiat – original; (7) Prince Duncan Williams – SilkThread Art – original; and (8) Synthia Saint James – original.

valued these eight pieces of artwork in her divorce inventory at approximately $31,950.00.[6] [*Id.*]. When asked about these omitted pieces at trial, the Debtor explained that because she was never in possession of the artwork during and after her divorce, she did not include them in the Original or Amended Schedules. [Finding of Fact No. 11]. "Unfortunately for the Debtor, this excuse has been rejected . . . '[d]ebtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or are unavailable to the bankruptcy estate.'" *Structured Asset Servs. v. Self* (*In re Self*), 325 B.R. 224, 246–47 (Bankr. N.D. Ill. 2005) (citing *In re Yonikus*, 974 F.2d 901, 904 (7th Cir. 1992)). Indeed the Debtor's excuse now does not comport with her testimony that she was attempting to mimic her property division from the divorce. [Tape Recording, June 11, 2014 Hearing at 3:14:37–3:15:06 p.m.]. If she had actually been doing so, the Debtor, in both the Original Schedules and the Amended Schedules, would have included these additional eight pieces of artwork that she was awarded. [Finding of Fact No. 11]. She did not. Thus, this Court finds that these omissions in the Original and Amended Schedules—which are certainly material—constitute false statements that the Debtor made under oath.

### c.  The Omission of the Watch on the Original Schedules

The Debtor failed to include a Jaeger-LeCoutre Reverso watch in the Original Schedules. [Finding of Fact No. 9]. As explained above, the Debtor signed the Original Schedules under oath and penalty of perjury that her Schedules were true and correct. [Finding of Fact No. 5]. Clearly, they were not. Because the Debtor omitted this watch in the Original Schedules, she made a false statement on her Schedules under oath and penalty of perjury. Granted, the Debtor did disclose this watch on her Amended Schedules, but this disclosure came well after the

---

[6] The appraiser retained by the Trustee never had the opportunity to value these eight pieces of artwork, and therefore the only value in the record is the $31,950.00 value which the Debtor set forth in her divorce inventory.

Trustee had discovered the existence of this watch. [*See* Tape Recording, June 11, 2014 Hearing at 1:52:54–1:53:17 p.m.]. The value that the Debtor places on this watch in the Amended Schedules is $1,500.00 [Finding of Fact No. 9], so there is no question that her failure to disclose this watch in the Original Schedules was a material omission.

2. <u>The Debtor Made Her False Statements with Fraudulent Intent Because the Debtor Demonstrated Reckless Indifference to the Truth in her Schedules</u>

The next element of the *Beaubouef* test requires the Trustee to establish that the Debtor made her statements with fraudulent intent. *Beaubouef*, 966 F.2d at 178. In *Beaubouef*, the bankruptcy court denied the defendant's discharge because he failed to list his position as an officer with a company. *Id.* The debtor knew he had such an interest in the company six years prior to filing his Chapter 7 petition. *Id.* Six months after a 2004 examination, the debtor amended his Schedules, but still failed to list his interest in yet another company. *Id.* The Fifth Circuit held that there was sufficient evidence of the debtor's reckless indifference to the truth based on "the existence of more than one falsehood, together with [the debtor]'s failure to take advantage of the opportunity to clear up all inconsistences and omissions when he filed his amended schedules." *Id.* (citing *In re Sanders*, 128 B.R. 963, 972 (Bankr. W.D. La. 1991)).

The Fifth Circuit has made it clear that a debtor is not entitled to a discharge where the debtor makes statements under oath with "reckless indifference to the truth." *Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir. 2001). The Fifth Circuit has held that a showing of reckless indifference to the truth is equivalent to showing the requisite fraudulent intent to deceive sufficient to deny a discharge under §727(a)(4)(A). *Beaubouef*, 966 F.2d at 178. A debtor who makes more than one false statement under oath with an opportunity to clear up the inconsistencies has demonstrated this recklessness, which is sufficient for the bankruptcy court to infer the debtor's requisite fraudulent intent. *Id.* Here, the Debtor has

demonstrated her reckless indifference to the truth by failing to provide full and complete disclosures in both the Original and Amended Schedules. *Id.*; *see also Sholdra*, 249 F.3d at 382 (finding that reckless indifference to the truth is the equivalent to a showing of fraudulent intent).

First, the Debtor initially failed to disclose numerous assets, including eight pieces of artwork. [Finding of Fact No. 6]. Moreover, similar to the debtor in *Beaubouef*, the Debtor only amended the Original Schedules after the Trustee discovered and brought to light the omissions and hired appraisers to value her assets. [Finding of Fact No. 9]. Additionally, the Debtor amended the Original Schedules to include a watch not disclosed in the Original Schedules and amended the valuations of her artwork and jewelry to be in line with the appraisers' valuations. [Findings of Fact Nos. 9 & 10]. But then, the Debtor testified that she *still* does not agree with the valuation of the jewelry but filed the Amended Schedules anyway [Finding of Fact No. 11], thus violating her oath—under penalty of perjury—that the information in the Amended Schedules is true and correct. Lastly, the Debtor had numerous opportunities to correct the Original Schedules regarding the omissions of pieces of artwork, but she never did. In totality, as in *Beaubouef*, there is sufficient evidence demonstrating the Debtor's pattern of falsehoods. Furthermore, the Debtor had the opportunity to correct all of these falsehoods, but failed to do so. She waited almost seven months after the Trustee raised the issue to amend the Original Schedules to correct the valuations. [Finding of Fact Nos. 7 & 9]. Under all of these circumstances, the Trustee has satisfied the fourth element of the *Beaubouef* test.

### 3. The Debtor's False Statements are Material to the Main Bankruptcy Case

A false oath is material if it relates to the debtor's "business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Beaubouef*, 966 F.2d at 178 (citing *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616,

617 (11th Cir. 1984)). A debtor's claim that she omitted an asset because she was not in actual possession of the asset is unavailing. *Id.* (citing 4 *Collier on Bankruptcy*, ¶ 727.04[1], at 727–59). Every debtor has a duty to disclose every potential interest in real property or personal property of any kind regardless of whether the debtor actually has possession of the asset.

In *Beaubouef*, the debtor claimed that he did not list a company in which he previously held an interest because the company no longer did business, it had no customers, and he was merely an employee of the company. *Id.* at 178–79. The Fifth Circuit held that this non-disclosure was a material omission because it constituted information that could have led to the discovery of assets. *Id.* at 179. Similarly, in his schedules and statement of financial affairs, the debtor in *Chalik* failed to list twelve corporations in which he owned some interest. *Chalik*, 748 F.2d at 618. In later depositions, the debtor disclosed his involvement with these corporations only when the trustee asked him specific questions about these corporations. *Id.* at 619. The Fifth Circuit held these facts to be sufficiently material to deny a discharge under § 727(a)(4)(A) because the information was necessary to determine the debtor's financial condition. *Id.* The Fifth Circuit further held that it was irrelevant whether the interests the debtor omitted had any value at the time he filed his bankruptcy petition. *Id.*

Similar to the debtors in both of the cases described above, the Debtor claims that she did not list numerous pieces of artwork on the Original Schedules because she did not have physical possession of them at the time of the filing of the Original Schedules. [Finding of Fact No. 11]. Pursuant to *Beaubouef* and *Chalik*, this explanation will not suffice. Indeed, based on the Debtor's divorce inventory, the missing pieces of art are valued at $31,950.00. [Finding of Fact No. 6]. These missing pieces of artwork, if monetized, would generate a substantial recovery for creditors. Moreover, with respect to the assets that the Debtor did disclose, she initially

understated the asset values—$2,850.00 for artwork and $2,075.00 for jewelry [Finding of Fact No. 5]—when they were actually valued by the appraisers at $8,700.00 and $19,250.00, respectively. [Finding of Fact No. 8]. These differences are unquestionably material and, therefore, grounds for barring the Debtor's discharge under § 727(a)(4)(A).

Finally, the Debtor maintains that she listed the values of the jewelry and artwork on the Original Schedules in the amounts of $2,075.00 and $2,850.00, respectively, because she believed the values provided by pawnshops were accurate. [Finding of Fact No. 11]. However, after the Trustee questioned the valuation of these items, the Debtor amended her Original Schedules three months after the Trustee's appraisers gave their valuations to conform her values with the appraisers' values. [Finding of Fact Nos. 8 & 9]. Like the debtor's false disclosures in *Beaubouef*, this Court finds that the Debtor's false disclosures here constitute material omissions because they constituted important information about the values of the Debtor's assets.

4. Amending the Schedules Does Not Excuse False Oaths

The Fifth Circuit has held that amendments to schedules do not excuse false oaths. *In re Sholdra*, 249 F.3d 380, 382 (5th Cir. 2001) (citing *Mazer v. United States*, 298 F.2d 579, 582 (7th Cir. 1962)). A debtor's assertion that he amended his statement of financial affairs or schedules is undermined as a defense if he files the amendments only **after** his deposition reveals such falsity in his original filings. *Id.* (citing *Swicegood v. Ginn*, 924 F.2d 230, 232 (11th Cir. 1991) (per curiam)); *see also Gebhardt v. Gartner (In re Gartner)*, 326 B.R. 357, 372 (Bankr. S.D. Tex. 2005) ("A debtor who makes more than one false statement under oath with **an opportunity to clear up the inconsistencies** has demonstrated his recklessness, which is sufficient for the bankruptcy court to infer the debtor's requisite [fraudulent] intent.") (emphasis added).

In *Sholdra*, the debtor filed amendments to his original schedules one week after his deposition revealed false statements in the original filings. *Id.* at 381. The court affirmed the denial of discharge based on the false oath, rejecting the defense that the debtor filed amendments. *Id.* at 382. Similarly, in *Beaubouef*, the debtor filed amendments six months after a 2004 examination revealed false statements in his original filings. *Beaubouef*, 966 F.2d at 178. In upholding the denial of the debtor's discharge, the *Beaubouef* court was not persuaded by the debtor's position that the amendments to the schedules and statement of financial affairs were sufficient. *Id.* Case law is clear that debtors cannot cleanse themselves of dishonesty in their schedules by coming clean with amended disclosures **after** a third party has first exposed their untruthfulness. *See Gartner*, 326 B.R. at 373.

Here, the Debtor amended the Original Schedules only after the Trustee questioned the valuation of the Debtor's artwork and jewelry on the Original Schedules and had the items appraised. [Finding of Fact Nos. 7 & 8]. The appraisal valuations were significantly higher than the values set forth in the Original Schedules. [Finding of Fact No. 10]. The Debtor only amended the Schedules **after** the Trustee brought these understated values to light. Thus, the Debtor's amendments, filed on October 14, 2013 [Finding of Fact No. 9]—approximately ten months after filing the Original Schedules—will not suffice as a defense to the Trustee's false-oath claim. The Debtor's omissions and misrepresentations discussed above therefore constitute false oaths sufficient to bar discharge of the Debtor's debts.

### C. Alternatively, the Debtor Should be Denied Her Discharge Under § 727(a)(3)

Under § 727(a)(3), a court may deny a debtor's discharge if the debtor has "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business

transactions might be ascertained . . . ." 11 U.S.C. § 727(a)(3). A debtor should not be discharged if the debtor fails to adequately maintain financial records that could assist a creditor or the trustee in ascertaining the debtor's financial situation, *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 703 (5th Cir. 2003), and a creditor or the trustee should not be required to hunt for the debtor's financial information. *United States v. Craig (In re Craig)*, 252 B.R. 822, 828 (Bankr. S.D. Fla. 2000) (citing *Govaert v. S. Nat'l Bank of N.C. (In re Caserta)*, 182 B.R. 599, 611 (Bankr. S.D. Fla. 1995)); *see also In re Juzwiak*, 89 F.3d 424, 427–28 (7th Cir. 1996) (holding that the creditor was not required to hire an accountant or obtain missing information from the debtor's customers in order to construct the debtor's financial history).

To make a *prima facie* case under § 727(a)(3), the Trustee must show that: (1) the Debtor failed to maintain and preserve adequate records; and (2) that this failure made it impossible to ascertain her financial situation and material business transactions. *Dennis*, 330 F.3d at 703. Although the debtor's disclosed records need not necessarily include specific financial information or be kept in any special manner, *Juzwiak*, 89 F.3d at 428 (citations omitted), § 727(a)(3) requires as a precondition to discharge that the records contain "enough information to ascertain the debtor's financial condition and track his financial dealings with *substantial completeness* and accuracy." *Bay State Milling Co. v. Martin (In re Martin)*, 141 B.R. 986, 995 (Bankr. N.D. Ill. 1992) (emphasis added); *Clark v. Kearns (In re Kearns)*, 149 B.R. 189, 190–91 (Bankr. D. Kan. 1992). Furthermore, a higher standard for the disclosure of records is required for a sophisticated debtor than that of an unsophisticated debtor because the former should be more aware of the importance of maintaining and producing financial records. *See Goff v. Russell Co. (In re Goff)*, 495 F.2d 199, 201–02 (5th Cir. 1974). Finally, § 727(a)(3) does **not** require a showing of intent to defraud or recklessness. *See, e.g., In re Martin*, 141 B.R. at 995.

Once the Trustee satisfies the elements required for a *prima facie* case under § 727(a)(3), the burden shifts to the Debtor to justify her failure to keep adequate records. *Dennis*, 330 F.3d at 703. Although the Code does not indicate what constitutes sufficient justification, it does require that a determination be made based on all circumstances of the case. As one court has noted:

> The issue of justification depends largely on what a normal, reasonable person would do under similar circumstances. The inquiry should include the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business . . . and any other circumstances that should be considered in the interest of justice.

*Milam v. Wilson (In re Wilson)*, 33 B.R. 689, 692 (Bankr. M.D. Ga. 1983). This burden may also be satisfied if the debtor demonstrates that "the neglected records were not in *any way* needed to ascertain the financial condition of the debtor." *Gartner*, 326 B.R. at 376 (citing *Dennis*, 330 F.3d at 703) (emphasis added).

Here, the Debtor failed to provide all of the financial records requested by the Trustee. On March 19, 2013, the Trustee sent an email requesting "the Debtor's bank records for the 3 years prior to bankruptcy, including statements, cancelled checks and deposit slips." [Finding of Fact No. 12]. The email also requested "a complete accounting of all monies put into and taken out of the insurance policies from their inception." *[Id.]*. On April 5, 2013, the Debtor's attorney provided bank statements for a Chase account ending in 0220 (April 13, 2012 to December 13, 2012), bank statements for a Chase account ending in 3628 (February 2010 to January 2013), bank statements for a Wells Fargo account ending in 4226 (October 31, 2012 to January 1, 2013), an account snapshot for a Wells Fargo account ending in 1047 (December 31, 2012 to February 28, 2013), an account snapshot for a Wells Fargo account ending in 6692

(October 31, 2011 to February 28, 2013), and an account snapshot for a Wells Fargo account ending in 6689 (October 31, 2011 to March 29, 2013). [Finding of Fact No. 13].

The records that the Debtor provided are filled with holes. She did not produce statements for multiple months from almost all of her bank accounts. [*Id.*]. The Debtor was also missing records of insurance deposits for multiple accounts. [*Id.*]. In addition, she did not include any cancelled checks or deposit slips. [Tape Recording, June 11, 2014 Hearing at 1:52:26–1:56:44 p.m.].

On April 5, 2013, the Trustee and Debtor agreed that the Debtor would obtain and provide to the Trustee only the bank statements and the insurance records from the date of inception. [Finding of Fact No. 14]. On April 10, 2013, the Trustee sent an e-mail to the Debtor stating that the Debtor's document production was incomplete and requesting that the remaining documents be produced as soon as possible. [Finding of Fact No. 15]. On April 22, 2013, the Debtor's attorney notified the Trustee that one of the banks had quoted the Debtor a fee of $720.00 to obtain those records. [Finding of Fact No. 16]. The email stated that the Debtor did not have the funds to pay the fee and requested an alternative solution. [*Id.*]. The Trustee responded that there was no alternative solution. [*Id.*].

1. The Trustee Has Made a *Prima Facie* Case Under § 727(a)(3)

Although the Debtor signed releases that would allow the Trustee to obtain the missing records from the banks and insurance companies, § 727(a)(3) requires the Debtor to disclose enough records that the Debtor's financial condition and transactions can be ascertained with "substantial completeness." The records that the Debtor failed to produce were significant. [*See* Finding of Fact No. 13]. Furthermore, the Trustee should not—as he has had to do here—have

to hunt for the Debtor's financial records by subpoenaing the banks and insurance company. [*See* Finding of Fact No. 20]. *Craig*, 252 B.R. at 828.

In addition, a sophisticated debtor has a higher standard of disclosure because he or she should know the importance of maintaining and producing financial information. *See Goff*, 495 F.2d at 201–02. Here, the Debtor has owned multiple businesses for a number of years and admits that she handled the finances for HRE. [Finding of Fact No. 2]. In addition, she is highly educated. [*Id.*]. Therefore, the Debtor is sufficiently sophisticated to know the importance of keeping financial records, and the marital discord she was experiencing at the time is insufficient justification to explain why she failed to maintain sufficient records concerning her financial condition.

    2.   <u>The Debtor Has Failed to Justify Her Failure to Keep Adequate Financial Records</u>

Because the Trustee has satisfied the elements of a *prima facie* case under § 727(a)(3), the burden is on the Debtor to justify why she cannot produce the necessary documents. *Dennis*, 330 F.3d at 703. In *Jacobowitz*, the debtor claimed that he failed to keep records because his income was at or below poverty level and his family relied in part upon charity. *Jacobowitz v. Cadle Co. (In re Jacobowitz)*, 309 B.R. 429, 439 (Bankr. S.D.N.Y. 2004). The court held that despite the debtor's financial situation, the debtor was not relieved of his responsibility to provide records upon reasonable requests from his creditors. *Id.*; *see Meridian Bank v. Alten*, 958 F.2d 1226, 1232 (3d Cir. 1992) ("Certainly insolvency cannot be used as an excuse to avoid the obligation to provide records to illuminate that condition."). The court explained that "[t]o hold otherwise would relieve all debtors who *claim* to be living in poverty from any obligation to provide adequate records even where they are involved in relatively sophisticated businesses." *Jacobowitz*, 309 B.R. at 439 (emphasis in original).

In the present suit, the Debtor claims her inability to provide the requested records is a result of her lack of funds. [Finding of Fact No. 16]. She asserts she did not have the $720.00 necessary to obtain her bank statements—documents she should have had in the first place. [*Id.*] However, the court in *Jacobowitz* specifically held that the debtor was not relieved of responsibility to produce records despite financial hardship. *Jacobowitz*, 309 B.R. at 439. Therefore, although the Debtor has testified that she did not have the funds to pay the fees requested by the bank, it was still her responsibility to provide the necessary documents to the Trustee.

Furthermore, although what constitutes an adequate justification has not been explicitly defined, "[a]n explanation which is based mostly upon an estimate of the debtor founded upon nothing by way of verification or affirmation by means of books, records or otherwise has been held unsatisfactory." 4 *Collier on Bankruptcy*, ¶ 727.08 (15th ed. 1979). In addition, "[m]ore is required from the debtor in the way of explanation than mere generalities." *Id.* Here, the Debtor has not provided verification of her supposedly deficient funds and failed to provide any specificity as to why she lacked the funds. Therefore, she has failed to satisfy her burden of proof in justifying why she has failed to provide financial records to the Trustee.

In sum, the Debtor has failed to provide sufficient financial records to obtain a discharge. Nor is she able to provide facts that are legally sufficient to justify why she has been unable to produce these records. This Court will therefore deny her discharge pursuant to § 727(a)(3).

### D. This Court Will Not Require the Debtor to Reimburse the Trustee for His Attorneys' Fees

The Trustee argues that this Court should award him attorneys' fees for the services which his attorneys rendered relating to dealing with the Debtor's stonewalling on disclosure of assets and production of documents as well as for prosecution of the Complaint Objecting to

Discharge. [Adv. Doc. No. 1, p. 7]. In accordance with the so-called "American Rule," courts typically do not award attorneys' fees to the prevailing party. *Galveston Cnty. Navigation Dist. No. 1 v. Hopson Towing Co.*, 92 F.3d 353, 356 (5th Cir. 1996) (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975)). "Generally, absent statute or enforceable contract, litigants must pay their own attorneys' fees." *Id.* Therefore, this Court must look to enforceable contract provisions or relevant statutes to determine whether it should award attorneys' fees to the Trustee.

At the outset, this Court can quickly dispose of any claim to an award of attorneys' fees based on an enforceable contract provision. The Trustee and the Debtor do not have a contract; thus, nothing can be relied on to grant an award of attorneys' fees. Even if the parties had a contractual provision that allowed for the recovery of attorneys' fees, the Trustee cannot assert such a provision in an action under § 727 of the Code. *See Tuloil, Inc. v. Shahid (In re Shahid)*, 254 B.R. 40, 44 (B.A.P. 10th Cir. 2000) (holding that a prevailing creditor on an objection to the debtor's discharge could not rely on an attorney fee provision in a contract with the debtor to claim an award of attorneys' fees.). Thus, this Court must rely upon a statute that acts as an exception to the "American Rule" to award the Trustee attorneys' fees.

In the suit at bar, the Trustee relies on § 727 to object to the Debtor's discharge. However, this section does not include a provision for attorneys' fees. Moreover, another bankruptcy judge in the Southern District of Texas—the Honorable Letitia Z. Paul—has held that § 727 "does not provide for an award of attorney fees to a Debtor who prevails in defense of an objection to discharge." *Reyes v. Farhangkhah (In re Farhangkhah)*, 473 B.R. 140, 152 (Bankr. S.D. Tex. 2012). Granted, the Trustee—not the Debtor—is the party seeking attorneys' fees in this suit. However, Judge Paul was quite clear in her determination that § 727

24

does not provide a basis for an award of attorneys' fees to the prevailing party. *See id.* Additionally, there is abundant authority across several circuits prohibiting an award of attorneys' fees in this context. *See, e.g.*, *Shahid*, 254 B.R. at 44; *Ameriprise Fin. Servs. v. Oristian (In re Oristian)*, Bankr. No. 12–24014PM, Adv. No. 12–0760PM, 2013 WL 5442365, at *2 (Bankr. D. Md. Sept. 30, 2013); *First United Bank & Trust Co. v. Buescher (In re Buescher)*, 491 B.R. 419, 439 (Bankr. E.D. Tex. 2013); *Cole Taylor Bank v. Yonkers (In re Yonkers)*, 219 B.R. 227, 234 (Bankr. N.D. Ill. 1997); *Netherton v. Baker (In re Baker)*, 205 B.R. 125 (Bankr. N.D. Ill. 1997); *Palmisano v. Leslie (In re Leslie)*, 44 B.R. 208 (Bankr. D. Vt. 1984).

In the suit at bar, the Trustee has failed to direct this Court's attention to any statute that supports an award of attorneys' fees. The lone authority upon which the Trustee relies—*Cruse v. Yates (In re Yates)*, 429 B.R. 675 (Bankr. E.D. Mo. 2010)—did not cite to any statute authorizing the award of attorneys' fees. The *Yates* court merely concluded that the trustee had reasonably incurred fees in the amount of $1,000.00. *Id.* at 682. This Court declines to adopt this holding. Moreover, not only did *Yates* fail to cite any authority for its award of attorneys' fees to the trustee, but the court only awarded $1,000.00, whereas the Trustee in this suit seeks fees in excess of $36,000.00. Due to this large discrepancy, the authority is not analogous. Relying on the *Yates* decision, the Trustee asserts that this Court has discretion to award attorneys' fees. However, there is significant authority to the contrary. *See, e.g.*, *Buescher*, 491 B.R. at 439. Indeed, this Court is bound by Fifth Circuit precedent and must justify an award of attorneys' fees based upon a statute or an enforceable contract provision. *Galveston Cnty. Navigation Dist. No. 1 v. Hopson Towing Co.*, 92 F.3d 353, 356 (5th Cir. 1996). Because the Trustee can identify neither, this Court finds no basis for awarding attorneys' fees.

## V.   CONCLUSION

Chapter 7 of the Code affords powerful relief by granting a discharge of all dischargeable debts to an honest debtor.  However, to obtain such relief, the debtor needs to observe the longstanding bankruptcy rule that "[c]omplete disclosure by the debtor is a quid pro quo for discharge of debts."  *Jacobowitz v. Cadle Co.* (*In re Jacobowitz*), 309 B.R. 429, 435 (Bankr. S.D.N.Y. 2004) (quoting Norton Bankr. Law & Prac. § 74:9 (2d. ed. 2003)); *see also In re Underhill*, 82 F.2d 258, 260 (2d Cir. 1936) ("Complete disclosure is in every case a condition precedent to the granting of a discharge . . . .").

Indeed, the bankruptcy process is only fair when debtors are willing to present themselves and their financial status fully and openly to the court and their creditors.  As such, discharge is a privilege granted to those who are willing to comply with the Code.  *See United States v. Cluck*, 87 F.3d 138, 140 (5th Cir. 1996); *see also Hill v. Jones* (*In re Jones*), 327 B.R. 297 (Bankr. S.D. Tex. 2005).

Here, the Debtor has been neither honest nor forthright regarding her disclosure of assets.  The Debtor has demonstrated a pattern of undervaluing and omitting assets in which she has a property interest; additionally, she did not produce financial records necessary for the Trustee to ascertain her financial status and business transactions.  Upon filing her bankruptcy petition in January of 2013, the Debtor had a duty to fully disclose all information that the Trustee might use to assess her financial condition.  *See, e.g.*, *Gebhardt v. Gartner* (*In re Gartner*), 326 B.R. 357, 378 (Bankr. S.D. Tex. 2005).  This duty includes disclosing every asset in which the Debtor had an interest and the accurate value of each asset.  *Id.*  Moreover, this duty includes providing to the Trustee all documents relevant to the Debtor's financial condition.  *Id.*  The Debtor failed to fulfill this duty and is therefore not entitled to a discharge of her debts.

Although the Trustee did have to perform substantial work to obtain the Debtor's financial records, to determine the accurate value of her artwork and jewelry, and to prosecute the Complaint Objecting to Discharge, the "American Rule" against awarding attorneys' fees applies. There is neither a contract nor a statute to which the Trustee can point that justifies his request. Thus, the Trustee's request for attorneys' fees is denied.

A judgment denying the Debtor's discharge will be entered on the docket simultaneously with the entry of this Opinion.

Signed this 2nd day of July, 2014.

Jeff Bohm
Chief United States Bankruptcy Judge

## Exhibit A (Valuation of Artwork)

| Name of Artist | Name of Artwork | Value on the Divorce Inventory | Value on the Original Schedules | Value on the Amended Schedules |
|---|---|---|---|---|
| Ted Ellis | Sunday Worship | $200.00 | $100.00 | $200.00 |
| Ted Ellis | Lone Angles | $200.00 | $100.00 | $200.00 |
| Ted Ellis | Buffalo Soldier on Patrol | $200.00 | $100.00 | $200.00 |
| Ted Ellis | Buffalo Soldier | $200.00 | $100.00 | $1,500.00 |
| Ted Ellis | Portrait of a Soldier | $1,850.00 | $200.00 | $200.00 |
| Ted Ellis | Family Day | $3,875.00 | $200.00 | $1,250.00 |
| Ted Ellis | Take me to the Water or Made in the Water | $750.00 | $150.00 | $200.00 |
| Ted Ellis | Park Paradise Strolls | $5,100.00 | $200.00 | $1,500.00 |
| Ted Ellis | Flowers for my Lady | $5,100.00 | $200.00 | $1,500.00 |
| Charles Bibbs | Feathered Hats | $1,400.00 | $100.00 | $200.00 |
| Charles Bibbs | The Seat of Knowledge | $6,000.00 | $200.00 | $200.00 |
| Charles Bibbs | Doing it and Doing Well | $2,000.00 | $200.00 | $200.00 |
| Charles Bibbs | Painted Plats | $2,000.00 | Undisclosed | Undisclosed |
| Twin | Joy | $1,700.00 | $100.00 | $400.00 |
| Twin | Mercy | $2,200.00 | $100.00 | $500.00 |
| Twin | First Lady | $1,600.00 | $100.00 | $400.00 |
| Catlette | Gossip | $4,400.00 | $200.00 | $200.00 |
| Catlette | Black Girl | $3,450.00 | Undisclosed | Undisclosed |
| Annie Lee | Holy Ghost #194 | $1,000.00 | $100.00 | $50.00 |
| Annie Lee | Mama Queen | $2,000.00 | $100.00 | $50.00 |
| Annie Lee | My Cup Runneth Over | $6,100.00 | $100.00 | $50.00 |
| Annie Lee | Blue Monday #185 | $1,500.00 | $100.00 | $50.00 |
| Annie Lee | Steepin N Soakin | $2,000.00 | $100.00 | $50.00 |
| Jacob Lawrence | Artist in Studio | $4,500.00 | Undisclosed | Undisclosed |

| Name of Artist | Name of Artwork | Value on the Divorce Inventory | Value on the Original Schedules | Value on the Amended Schedules |
|---|---|---|---|---|
| Catherine | Lady | $2,000.00 | Undisclosed | Undisclosed |
| Catherine | Group of People Walking with Umbrellas | $2,000.00 | Undisclosed | Undisclosed |
| Marcus Glenn | Mario & Howard with Basquiat | $12,800.00 | Undisclosed | Undisclosed |
| Prince Duncan Williams | Silk Thread Art | $4,000.00 | Undisclosed | Undisclosed |
| Synthia Saint James | Synthia Saint James | $1,200.00 | Undisclosed | Undisclosed |
| **TOTAL** | | **$81,325.00** | **$2,850.00** | **$9,100.00** |

2

## Exhibit B (Valuation of Jewelry)

| Description of Item | Value on the Divorce Inventory | Value on the Original Schedules | Value on the Amended Schedules |
|---|---|---|---|
| 1 pair vintage round diamond earrings | undisclosed | $50.00 | $300.00 |
| 1 pair diamond 3 drop earrings | undisclosed | $100.00 | $350.00 |
| 3 pendants | undisclosed | $100.00 | $1,250.00 |
| 1 gold high school class ring | undisclosed | $25.00 | $110.00 |
| 1 women's Patek Phillippe black watch | undisclosed | | |
| 1 brown leather folder on Patek Phillipe watch | undisclosed | $400.00 | $7,000.00 |
| 1 pair chandelier white gold and ruby earrings | undisclosed | $75.00 | $850.00 |
| 1 white gold ring with diamonds on circular dome | undisclosed | $75.00 | $1,400.00 |
| 1 pear diamond band (David Yurman) | undisclosed | $100.00 | $350.00 |
| 1 vintage diamond ring with stone in center (gold cluster ring) | undisclosed | $100.00 | $275.00 |
| 1 white gold chain (white gold ring with flexible links) | undisclosed | $25.00 | $700.00 |
| 1 white gold chain with diamond heart pendant | undisclosed | $75.00 | $550.00 |
| 1 white gold chain with diamond and ruby pendant | undisclosed | $50.00 | $700.00 |
| 1 white gold bracelet with diamond clovers on it | undisclosed | $50.00 | $850.00 |
| 1 white gold necklace (Sea Magic) | undisclosed | $50.00 | $350.00 |
| 1 white gold diamond cross pendant (with platinum box chain) | undisclosed | $25.00 | $650.00 |
| 2 white gold small chains | undisclosed | $30.00 | not listed |
| 1 white gold band with ruby in center and small diamonds | undisclosed | $75.00 | not listed |
| —miscellaneous gold earrings and chain necklace | undisclosed | not listed | $250.00 |
| 1 engagement ring with solitaire in center (diamond wedding set) | undisclosed | $325.00 | $5,500.00 |
| 1 wedding band (gold and diamond) | undisclosed | $100.00 | $400.00 |
| 1 white gold ring with small diamonds on round top (Sea Magic) | undisclosed | $100.00 | $125.00 |
| 1 pair white gold and diamond earrings (Sea Magic) | undisclosed | $50.00 | $125.00 |

| Description of Item | Value on the Divorce Inventory | Value on the Original Schedules | Value on the Amended Schedules |
|---|---|---|---|
| 1 pair white gold rope earrings with small diamonds | undisclosed | $50.00 | $600.00 |
| 1 silver or white gold ring with tanzanite stones | undisclosed | $25.00 | $100.00 |
| 1 Jaeger-LeCoutre Reverso watch | not listed | not listed | $1,500.00 |
| **TOTAL** | undisclosed | **$2,055.00** | **$24,285.00** |

2